WILMER CUTLER PICKERING
   HALE AND DORR LLP
Brian R. Michael (SBN: 240560)
   brian.michael@wilmerhale.com
350 South Grand Avenue
Los Angeles, California  90071
Telephone:  (213) 443-5374
Facsimile:  (213) 443-5400

WILMER CUTLER PICKERING
   HALE AND DORR LLP
Seth P. Waxman (*Pro Hac Vice*)
   seth.waxman@wilmerhale.com
Randolph D. Moss (*Pro Hac Vice*)
   randolph.moss@wilmerhale.com
Carl J. Nichols (*Pro Hac Vice*)
   carl.nichols@wilmerhale.com
Annie L. Owens (*Pro Hac Vice*)
   annie.owens@wilmerhale.com
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363

THE BOEING COMPANY
Steven W. Horton (*Pro Hac Vice*)
   steven.w.horton@boeing.com
J. Steven Rogers (*Pro Hac Vice*)
   steven.rogers@boeing.com
Steven E. Rusak (*Pro Hac Vice*)
   steven.e.rusak@boeing.com
P.O. Box 3707 MC 7A-XP
Seattle, Washington  98124
Telephone:  (425) 865-1074
Facsimile:  (425) 865-7998

Attorneys for Plaintiff The Boeing Company

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE BOEING COMPANY,<br><br>         Plaintiff,<br><br>     v.<br><br>LEONARD ROBINSON, in his official capacity as the Acting Director of the California Department of Toxic Substances Control,<br><br>         Defendant. | Case No. CV 10-04839-JFW (MANx)<br>Civil Action<br><br>**DECLARATION OF ARTHUR J. LENOX IN SUPPORT OF PLAINTIFF THE BOEING COMPANY'S MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date:  April 11, 2011<br>Time:  1:30 p.m.<br>Courtroom:  16<br>Judge:  Hon. John F. Walter<br>Pretrial Conference:  May 20, 2011<br>Trial Date:  June 7, 2011 |

I, Arthur J. Lenox, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Arthur J. Lenox. I am over the age of eighteen (18) years, and I am fully competent to make this declaration. I make this declaration based on my own personal knowledge and on knowledge that I have gained through my professional responsibilities. The facts stated herein are all true and correct, and if called to testify, I would and could competently testify as set forth below.

2. I am currently employed by The Boeing Company ("Boeing") as the Remediation Project Manager at the Santa Susana Field Laboratory ("SSFL") in Ventura County, California. I have been in my current position since 1993, when I was hired by Rockwell International, which Boeing acquired in 1996. My responsibilities as Remediation Project Manager at SSFL involve conducting soil and groundwater investigations and overseeing interim cleanup actions. Through 2007, I was also responsible for managing a Resource Conservation and Recovery Act ("RCRA") corrective action program addressing contamination related to five decades of rocket engine testing at SSFL.

3. Before my employment at Boeing, I worked at Hughes Aircraft Company as a specialist in Safety, Health, and Environmental Affairs with their Electron Dynamics Division, from 1988–1991. In that capacity, I was responsible for safety and health at a facility involved with semiconductor research and development; conducted industrial hygiene monitoring, asbestos surveys, and environmental training; and managed a remediation project. From 1991–1993, I was a specialist in Safety, Health, and Environmental Affairs with the Hughes Aircraft Missile Systems Group. In that position, I was responsible for ensuring compliance with safety and environmental requirements. I was also responsible for compliance related to air quality, hazardous waste and industrial wastewater, as well as acquiring and updating permits, conducting safety and environmental audits, removal of underground storage tanks, and managing a soil and groundwater remediation project. My responsibilities also included regulatory

agency interaction and negotiations and development of a storm water pollution protection program that was implemented at several sites.

4. I hold a Master of Science degree in Environmental and Occupational Health from California State University, Northridge. In addition, I hold a bachelor's of art degree in Geography from California State University, Northridge. I also hold a certification in Hazardous Materials Management from the University of California, Los Angeles and am certified in OSHA Hazardous Waste Operations and Emergency Response Training. I have extensive experience in environmental investigation, cleanup, and compliance issues.

5. I have been involved in managing and overseeing environmental investigation and cleanup of chemical contamination at SSFL for 17 years and am familiar with SSFL's history and operations. During the course of my employment at Boeing,[1] I have also become familiar with Boeing's responsibilities at SSFL pursuant to contracts with the federal government, as well as with California Senate Bill 990 ("SB 990"), Cal. Health & Safety Code § 25359.20, and its implications for environmental cleanup at SSFL. In the regular course of performing my duties at SSFL as a Remediation Project Manager, I have reviewed thousands of documents, including documents describing historical site operations, as well as documents analyzing the extent, nature, and source of chemical contamination at the SSFL site. In addition, I have reviewed and edited reports and analyses prepared by professional geologists and engineers describing the extent, nature, and source of chemical contamination at SSFL.

---

[1] References to "Boeing," where appropriate, also include Rockwell International, which Boeing acquired (along with its interest in SSFL) in 1996, and North American Aviation, Rockwell International's predecessor company.

DECLARATION OF ARTHUR J. LENOX  CASE NO. CV 10-04839-JFW (MANx)
-2-

## I. SSFL, A Former Federal Rocket-Testing And Nuclear-Energy Research Facility, Was Used Predominantly For Federal Operations Throughout Its History

6. An important component of the investigation and characterization phases of any site remediation process is gaining an understanding of the historical operations and which operations are likely to have resulted in the contamination at the site. Activity for or on behalf of the federal government comprised the vast majority of historical operations at SSFL.

7. SSFL is a former research and development facility consisting of approximately 2,850 acres in the Simi Hills area of Ventura County, California. Boeing has performed a broad range of research and development activities for the federal government in its capacity as a government contractor at SSFL.

8. Boeing has owned or occupied property at the SSFL site since the late 1940s and has used it predominantly to perform work on behalf of the federal government. Boeing currently owns approximately 2,398 acres of the site.

9. The federal government has also owned or leased property at the SSFL site since the 1950s. Currently, the federal government owns approximately 452 acres of the site, which it presently administers through the National Aeronautics and Space Administration ("NASA") and previously administered through the United States Air Force. The federal government also leases from Boeing approximately 90 acres of the site, which the United States Department of Energy ("DOE") administers.[2]

10. The SSFL site consists of the following four administrative areas, as well as two undeveloped areas on the southern and northwestern boundaries of the facility:

(a) Area I consists of 671 acres owned by Boeing and 42 acres owned by the U.S. government and administered by NASA in the northeast portion of the

---

[2] References to "NASA" and "DOE" include their predecessor agencies.

DECLARATION OF ARTHUR J. LENOX  CASE NO. CV 10-04839-JFW (MANx)

-3-

site. This area contains administrative facilities, laboratories, and test facilities and was formerly used for federal rocket-engine testing.

(b) Area II consists of 410 acres in the north-central portion of the site and is owned by the federal government and administered by NASA. This area contains formerly used federal rocket-engine test and laboratory facilities.

(c) Area III consists of 114 acres in the northwest portion of the site and is owned by Boeing. This area contains a formerly used systems test area that supported federal rocket-engine testing activities and associated laboratories.

(d) Area IV consists of 290 acres owned by Boeing, including the 90-acre area leased by DOE. Area IV was used primarily for federal nuclear-energy research on behalf of DOE.

(e) The northwestern and southern undeveloped areas consist of 182 and 1143 acres, respectively. No industrial activities have taken place in these undeveloped areas.

11. Although no longer used for these purposes, historically, SSFL was used primarily for testing rocket engines and engine components on behalf of the federal government and for federal nuclear reactor research and associated activities. These federal research and development programs at SSFL have resulted in pioneering technologies, many of which have contributed to critical missions undertaken by the United States government in national defense, space exploration, and nuclear energy.

12. SSFL began as a test site for the United States military after World War II when North American Aviation[3] received a contract from the United States Air Force to develop the Navaho guided missile system. In 1947, North American established operations at SSFL to test that system. SSFL's isolated location in the Simi Hills and its rocky terrain made it well suited for such activity. North

---
[3] *See supra* note 1.

American Aviation and its successors continued to use SSFL to test ballistic missile systems under contract to the military throughout the Cold War.

13. The Air Force and NASA also sponsored tests of large liquid-propellant rocket engines and components at SSFL from the 1950s to 2006. Boeing carried out these tests in its capacity as a federal prime contractor. The rocket engines or components tested as part of this federal program included the Navaho, Atlas, Jupiter, Thor, E-1, H-1, X-1, X-4, F-1, RS-27, and Delta engines, as well as the Space Shuttle Main Engine. Many of those engines powered major American expeditions into space, including the Apollo missions and the Moon landing.

14. To support this work, Boeing, under federal contract, constructed two rocket test stand areas in the Boeing-owned portion of Area I, and four rocket test stand areas on NASA-owned property in Area II. Boeing operated these six rocket test stand areas under a series of federal facilities contracts. Boeing also conducted testing on rocket components in laboratories and other facilities in Areas I, II, and III in support of these federal programs.

15. The vast majority of rocket-engine testing and support operations at SSFL throughout the years was conducted for or on behalf of the federal government. To the extent there was some commercial rocket-engine testing at SSFL, any such testing or support operations would have been performed on the same test stands or in the same laboratories that supported the federal rocket-testing activity.

**II. The Vast Majority Of Chemical Contamination At SSFL Resulted From Federal Activity**

16. Historical operations at SSFL—in particular the rocket-engine testing activity described above—resulted in chemical contamination in the SSFL soil, bedrock, and groundwater. Characterization of chemical contamination at SSFL has been ongoing for more than 25 years and has involved the taking of more than

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue
Los Angeles, California 90071

35,000 soil, bedrock, and groundwater samples; the preparation of more than 100,000 pages of analysis, including eleven RCRA Facility Investigation reports, which detail the sources and extent of chemical contamination throughout the site; and the submission of approximately 800,000 thousand pages of historical and technical documents in support of these studies. Although further characterization of the site is ongoing, the extensive work that has been done to date is more than sufficient to identify the principal sources, types, and locations of contamination. It is clear from these analyses, as well as from my general knowledge of the operational history of SSFL, that the vast majority of chemical contamination at SSFL resulted from federal activity. This contamination can be found in all operational areas of the SSFL site and is not limited to the areas owned, controlled, or leased by the federal government.

17. A primary chemical contaminant of concern at SSFL is trichloroethylene ("TCE"), which has been detected in the SSFL soil, bedrock, and groundwater. Until the mid 1990s, TCE was used as a solvent to clean the large liquid-propellant engines and to wash off the rocket test stands between tests during the federal rocket-testing programs described above. In the early years of rocket testing, no containment systems were in place to prevent the TCE from running into the ground. Catch pans were installed in 1961, and the effectiveness of those TCE containment systems increased over the years. NASA has determined that a total of 530,400 gallons of TCE were released into the ground at SSFL as a result of federal rocket-testing activities. *See* NASA, Records Search and Trichloroethylene Release Assessment for Santa Susana Field Laboratory, Ventura County, California (June 1993), at ES-5, attached as Exhibit 5. NASA has also determined that 97% of that total release occurred prior to 1962 both because there was a large drop in the number of annual tests after that date and because the catch pans that had been installed in 1961 minimized the amount of TCE released into the soil. *Id.* This report also documents that approximately 88% of TCE

released to the ground can be attributed to Department of Defense testing and related activities, while 12% of such TCE releases can be attributed to NASA activities. *Id.*

18. As a result, even if one assumes that some TCE contamination at SSFL resulted from private commercial rocket-testing activities, the amount of such contamination would be exceedingly small compared to the contamination resulting from the half-million gallons of federal TCE released at the site, particularly because any private commercial rocket-engine testing almost certainly would have occurred after the installation of catch pans in 1961. Indeed, TCE contamination resulting from federal activity at SSFL likely exceeds 99% of the total TCE contamination at the site.

19. Even assuming that private commercial rocket-engine testing had resulted in TCE contamination, any such contamination would be indistinguishable from and/or inextricably intermixed with contamination resulting from federal activities. This is based on the following facts: (1) any use of TCE during private commercial rocket-testing activity would have occurred on the same rocket test stands and in the same areas that were used for federal rocket-testing activities; (2) any private commercial rocket testing would have been done during a time frame in which federal rocket testing was also being performed; and (3) the TCE used for operations at a particular test stand would have been pumped from the same holding tank, regardless of whether the rocket to be tested were federal or commercial.

20. In addition to TCE contamination, other chemical contamination resulted from federal activities at SSFL in Areas I, II, III, and IV. These other chemical contaminants of concern include perchlorate, heavy metals, PCBs, dioxins, volatile organic compounds, and semivolatile organic compounds. The overwhelming majority of this contamination involving these chemicals of concern is the result of federal activities performed for the military, NASA, or DOE at the

DECLARATION OF ARTHUR J. LENOX
-7-
CASE NO. CV 10-04839-JFW (MANx)

site. These contaminants of concern are chemicals associated with large rocket engine testing or related supporting activities in Areas I, II, and III. Some of these same chemical contaminants of concern, such as perchlorate and heavy metals, are also associated with solid propellant research and testing in Area I. All of the same chemical contaminants of concern are present in Area IV, most likely as a result of DOE-sponsored operations, including liquid metal experiments and activities related to energy research.

21. Even assuming that private commercial activity had resulted in some perchlorate, heavy metal, PCB, dioxin, volatile organic compound, or semivolatile organic compound contamination at SSFL, the volume of any such chemical contamination would be exceedingly small in comparison to the overall chemical contamination resulting from federal programs. Moreover, to the extent there were any significant areas of such contamination, such contamination would be indistinguishable from and/or inextricably intermixed with contamination resulting from federal activities. This is based on the following facts: (1) any private commercial activity would have occurred in the same areas or buildings that were used for federal activities; (2) any private commercial activity would have been done during a time frame in which federal activity was also being performed; and (3) to the best of my knowledge, any private commercial activities would have used many of the same chemicals that were used during federal activities.

### III. Before SB 990, Cleanup Of Chemical Contamination At SSFL Was Being Conducted Pursuant To Generally Applicable State Law, And The Most Restrictive Land-Use Scenario Considered Was Suburban-Residential

22. Boeing is actively conducting the cleanup at SSFL, and, in doing so, continues to serve as a DOE and NASA contractor. It pays a portion of the costs, and will bear the portion of the cleanup costs not paid by or recovered from the federal government in an allocation proceeding. Before the enactment of SB 990, the cleanup at SSFL was conducted on two separate tracks – one for chemical

contamination and one for radiological contamination.

23. Before SB 990, the California Department of Toxic Substances Control ("DTSC") regulated the cleanup of chemical (*i.e.*, non-radiological) contamination at SSFL under generally applicable state environmental laws. Specifically, the cleanup was being conducted pursuant to California Health & Safety Code chapter 6.5, which is the state-law analog to the federal RCRA, 42 U.S.C. §§ 6901, *et seq*.

24. I was Boeing's SSFL Remediation Project Manager during the RCRA investigation phase of the cleanup. From that experience, and my general expertise in remediation issues, I am familiar with generally applicable State-law cleanup requirements. A key component in determining the ultimate cleanup standard to be applied to a contaminated site pursuant to generally applicable State (and federal) law is the reasonably foreseeable land-use assumption, which drives the exposure assumptions, which in turn drives the risk assessment. Risk assessments intentionally make conservative assumptions about the potential scenarios and pathways (*e.g.*, ingesting soil or drinking water) under which human and other ecological receptors may be exposed to contamination. Each future land-use scenario assumes exposure to residual contamination at the site through a number of different "pathways," such as air, water, and food grown on the site. In virtually all instances, the greater the number of exposure pathways that are assumed, the more stringent the cleanup must be. For example, an agricultural land-use scenario will result in the most stringent cleanup for most chemical contaminants because it assumes that the land will be used as a subsistence farm in which hypothetical future residents will be exposed to contaminants by growing 100% of the food they consume on the land. By contrast, a suburban-residential land-use scenario will result in a less stringent cleanup because it assumes fewer pathways of exposure, including that hypothetical future residents will obtain from the land a much smaller percentage of the food they consume.

25. As a matter of general practice, the reasonably foreseeable land-use assumption for a particular site is determined after consideration of multiple site-specific factors, including the current use of the land, the intended future use of the land, the local zoning and general plan, any institutional controls, cultural factors, and the presence of endangered species. The chosen reasonably foreseeable land-use assumption affects the conduct of sampling and chemical characterization and the analysis in the RCRA Facility Investigation reports that must be submitted leading up to the application of the ultimate cleanup standard to the site. In 2005, Boeing submitted a Standardized Risk Assessment Methodology Work Plan, attached as Exhibit 7, outlining the approach to sampling and characterization to be used at SSFL. That Work Plan took into account three different reasonably foreseeable land-use scenarios, the most restrictive of which was a suburban-residential scenario. An agricultural land-use assumption, which is more stringent than any of the three scenarios considered, was not contemplated. DTSC approved this Work Plan in 2005 in a letter attached as Exhibit 8.

26. In 2007, DTSC, NASA, DOE, and Boeing entered into a RCRA Consent Order for Corrective Action, attached as Exhibit 1, which governed the remediation procedure for non-radiological contamination at SSFL. That Consent Order incorporated the procedures set forth in the Standardized Risk Assessment Methodology Work Plan, including the use of a suburban-residential reasonably foreseeable land-use assumption. Until the passage of SB 990, Boeing's chemical sampling protocol, its chemical characterization, and its RCRA Facility Investigation reports were based on the DTSC-approved reasonably foreseeable land-use assumptions included in the Standardized Risk Assessment Methodology Work Plan discussed above, which did not include an agricultural land-use scenario.

27. Before SB 990, DOE was conducting the cleanup of radiological materials in Area IV pursuant to its authority under the Atomic Energy Act of

1954, 42 U.S.C. §§ 2011, *et seq.*  DOE had also approved remediation criteria requiring cleanup to a suburban-residential standard.  In contrast to its role in the cleanup of chemical contamination at SSFL, DTSC was not involved in the cleanup of radiological contamination.

**IV.  SB 990 Differs From Generally Applicable Law By Mandating The Use Of An Agricultural Land-Use Assumption For SSFL, Regardless Of How SSFL Is Actually Likely To Be Used In The Future**

28.  SB 990 was signed into law in October 2007.  It applies only to SSFL and mandates the application of cleanup procedures at SSFL that are more onerous than those that apply to other contaminated sites throughout the State.

29.  SB 990 seeks to consolidate the cleanup of chemical and radiological contamination at SSFL under the authority of DTSC pursuant to California's "mini-CERCLA" law, California Health & Safety Code chapter 6.8.  Like California Health & Safety Code chapter 6.5 (and federal law), a key driver in the cleanup analysis under chapter 6.8 is the reasonably foreseeable use of the land.  As discussed above, this determination is based on multiple site-specific factors.

30.  In a deviation from generally practice, however, SB 990 requires that, "[i]n calculating the risk … the land use assumption shall be either suburban residential or rural residential (agricultural), whichever produces the lower permissible residual concentration for each contaminant."  Cal. Health & Safety Code §25359.20(c).  Thus, instead of basing the ultimate cleanup standard to be applied at SSFL on the reasonably foreseeable use of the land, SB 990 mandates a particular land use assumption—the stricter of suburban residential or agricultural—without regard to how the land, in fact, is likely to be used.

31.  In almost all cases, this will result in the application of an agricultural land-use assumption, even though SSFL will not be used as a farm in the future.  The site is currently being used for industrial purposes; Boeing has publicly committed permanently to restrict and dedicate its property at the SSFL site to public use as open space upon completion of a cleanup to a suburban-residential

standard; and SSFL is located in an area designated for open space use under the Ventura County General Plan.

32. Because the reasonably foreseeable land use assumption affects the cleanup procedures that are applied even before an ultimate cleanup remedy is selected at the site, SB 990's agricultural land use assumption imposes considerably more stringent requirements on SSFL with respect to sampling, characterization, and data analysis. Moreover, under SB 990 procedures, the ultimate cleanup standard applied at SSFL will be far more stringent than that which would have been applied under the pre-SB 990 suburban-residential land-use assumption.

33. Finally, SB 990 differs from generally applicable law in that it prevents Boeing from transferring its land until the Director of DTSC certifies "that the land has undergone complete remediation pursuant to the most protective standards" in SB 990. Cal. Health & Safety Code §25359.20(e).

## V. SB 990 Is Delaying Cleanup At SSFL, And Will Impose Substantial Additional Costs

34. SB 990 has caused Boeing to sustain, and will continue to cause Boeing to sustain, harm in the form of substantial additional expenses and demands on resources and time that Boeing would not otherwise have sustained under pre-SB 990 law.

35. For example, Boeing is incurring additional expenses in modifying soil background analyses and developing rural residential risk based screening levels as a result of SB 990, and will be required to perform additional sampling and analysis of contamination at the site to comply with SB 990. In addition, citing SB 990's heightened cleanup requirements for radiological and chemical constituents, DTSC has rescinded its previous approval for use of an on-site soil borrow area for SSFL cleanup projects. As a result, Boeing has been required to identify and establish a new on-site soil borrow area, which is used to obtain clean soil to backfill other excavation areas at the site. This work was performed at

considerable expense and time commitment to the company. *See Letter from J. Pappas to A. Lenox re Recision of DTSC's September 29 2000 Letter Approving Use of the Area IV Soil Backfill Area (SBA) Soils for Use as Clean Backfill at Santa Susana Field Laboratory* (Jan. 16, 2009), attached as Exhibit 9. Further, Boeing has been engaged in extensive interaction with DTSC regarding the implementation of SB 990 requirements and in negotiations related to amending the 2007 RCRA Consent Order to incorporate SB 990's procedures. Boeing has also incurred expenses in generating related materials on methods of implementation and the likely effect of SB 990.

36.  SB 990's requirements have already hindered and delayed the cleanup process. If allowed to stand, SB 990 will delay the completion of remediation at SSFL and increase the cost of the cleanup (which will be allocated between Boeing and the federal government) by hundreds of millions of dollars. Complete remediation of the entire site—including soil, groundwater, and bedrock—under SB 990 could take centuries. Under SB 990, Boeing will remain prohibited from transferring its land until DTSC certifies that the cleanup is complete.

37.  Attached as **Exhibit 1** is a true and correct excerpted copy of the *Consent Order for Corrective Action in the Matter of Santa Susana Field Laboratory, Docket No. P3-07/08-003*, entered into between the California Department of Toxic Substances and The Boeing Company ("Boeing"), the National Aeronautics and Space Agency ("NASA"), and the U.S. Department of Energy ("DOE") (August 16, 2007). This document is a record of a public office or agency and sets forth the activities of that office or agency. This Consent Order is part of an administrative action taken by DTSC and is signed by Norman Riley, SSFL Project Director for DTSC, on August 16, 2007.

38.  Attached as **Exhibit 2** is a true and correct excerpted copy of *Historic Resources Survey and Assessment of the NASA Facility at Santa Susana Field Laboratory, Ventura County, California*, prepared by Archeological Consultants,

Inc. and Weitze Research for NASA in May 2008 and revised in March 2009. This document is a record of a public office or agency and sets forth the activities of that office or agency. This document was prepared as part of environmental studies conducted for NASA, as statutorily required under the National Historic Preservation Act and the National Environmental Protection Act (NEPA). It is held and maintained by NASA.

39. Attached as **Exhibit 3** is a true and correct excerpted copy of *Historic Resources Survey and Assessment of the Bowl in Area I of the Santa Susana Field Laboratory, Ventura County, California*, prepared by Post/Hazeltine Associates for Boeing and dated Aug 3, 2010. This document is a record of a public office or agency and sets forth the activities of that office or agency. This Report was prepared in support of the building demolition program undertaken by Boeing. This Report adhered to federal guidelines for Historic Cultural Resource Studies and set forth the activities of Boeing as a federal contractor to DOE and NASA, and was submitted to the California DTSC. It is held by DTSC in the agency's SSFL Archives – Document Library, on file under RCRA Facility Investigation – Soils: Building Demolition. Boeing contractors with knowledge of the subject matter created this Report and Boeing kept it in the normal course of regularly conducted business, as is the regular practice of the Company.

40. Attached as **Exhibit 4** is a true and correct excerpted copy of *Historic Resources Survey and Assessment of Selected Potential Historic Resources in Area I, III, and IV of the Santa Susana Field Laboratory, Ventura County, California* prepared by Post/Hazeltine Associates for Boeing, dated November 12, 2010. This Report was prepared in support of the building demolition program undertaken by Boeing. This Report followed federal guidelines for Historic Cultural Resource Studies and set forth the activities of the U.S. Department of Energy and NASA. Boeing contractors with knowledge of the subject matter created this Report and

Boeing kept it in the normal course of regularly conducted business, as is the regular practice of the Company.

41. Attached as **Exhibit 5** is a true and correct excerpted copy of Vol. 1 of *Records Search and Trichloroethylene Release Assessment for Santa Susana Field Laboratory, Ventura County, California* prepared by CH2M Hill as contractor for NASA, dated June 1993. This document is a record of a public office or agency and sets forth the activities of that office or agency. This Report was prepared at the direction and request of NASA and the U.S. Army Corps of Engineers in order to comply with the statutory requirements of the Defense Environmental Restoration Program for apportioning liability between the U.S. Department of Defense and NASA. It is held and maintained by NASA.

42. Attached as **Exhibit 6** is a true and correct excerpted copy of a *Feasibility Study Work Plan for Santa Susana Field Laboratory, Ventura County, California* prepared by MWH Americas, Inc. as sub-contractor for DOE, NASA and contractor to Boeing in April 2009 to comply with the Consent Order in the Matter of Santa Susana Field Laboratory, Docket No. P3-07/08-003. This document is a record of a public office or agency and sets forth the activities of that office or agency. This work plan was prepared as required by a California Department of Toxic Substances Control (DTSC) administrative law enforcement action. It was submitted to, and is held and maintained by, DTSC. Boeing contractors with knowledge of the subject matter created this Report and Boeing kept it in the normal course of regularly conducted business, as is the regular practice of the Company.

43. Attached as **Exhibit 7** is a true and correct excerpted copy of *Standardized Risk Assessment Methodology (SRAM) Work Plan for Santa Susana Field Laboratory, Ventura County, California*, prepared by MWH Americas, Inc. as sub-contractor for DOE, NASA and contractor to Boeing in September 2005. This document is a record of a public office or agency and sets forth the activities

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue
Los Angeles, California 90071

of that office or agency.  This document supersedes the original SRAM approved by the Human and Ecological Risk Division (HERD) of the California Environmental Protection Agency (Cal-EPA) in June 2000. This revision to the SRAM was produced at the request of California DTSC because it includes, expands on, and provides additional information to supplement the original SRAM.  The preparation of a work plan was required by the federal Resource Conservation and Recovery Act (RCRA) Corrective Action Program at SSFL.  This document was submitted to, and is held and maintained by, DTSC.  Boeing contractors with knowledge of the subject matter created this Report and Boeing kept it in the normal course of regularly conducted business, as is the regular practice of the Company.

44. Attached as **Exhibit 8** is a true and correct copy of a *Letter dated November 3, 2005, from California DTSC, signed by Gerard Abrams, Program Manager, to Arthur Lenox* in my capacity as the Remediation Project Manager for the SSFL site for Boeing regarding DTSC's approval of the Standardized Risk Assessment Methodology (SRAM) Work Plan for the SSFL, Revision 2 (September 2005).  This document is a record of a public office or agency and sets forth the activities of that office or agency.  This Letter sets forth DTSC's review of the SRAM Work Plan Revision 2 at SSFL.

45. Attached as **Exhibit 9** is a true and correct copy of a *Letter dated January 16, 2009 from the California DTSC, signed by James Pappas, Program Manager, to Arthur Lenox* in my capacity as Boeing's Remediation Project Manager for the SSFL site, regarding the Recision of DTSC's September 20, 2000 Letter Approving Use of Area IV Soil Backfill Area Soils for Use as Clean Backfill at SSFL.  This document is a record of a public office or agency and sets forth the activities of that office or agency.  This Letter sets forth the activities of the California DTSC at SSFL.

46. Attached as **Exhibit 10** is a true and correct copy of a *Letter dated February 11, 2009 from the California DTSC, signed by Rodney Collins, Program Manager to Thomas Glick, City Planner, City of Los Angeles* regarding the Status of the DTSC Investigation and Remediation of the Corporate Pointe Property at West Hills, California. This document is a record of a public office or agency and sets forth the activities of that office or agency. This Letter sets forth the activities of DTSC and the City of Los Angeles with regard to property in West Hills, California.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 25, 2011.

_____
Arthur J. Lenox